**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

Paul's Industrial Garage, LLC, and Gibson
Sanitation, LLC,

                              Plaintiffs,

                                              Civ. No. 06-4770 (RHK/JSM)
                                              **MEMORANDUM OPINION AND
ORDER**

v.

City of Red Wing, *et al.*,

                              Defendants.

---

Lee U. McGrath, Nick Dranias, Institute for Justice, Minnesota Chapter, Minneapolis, Minnesota, for Plaintiffs.

John M. Baker, Pamela L. VanderWiel, John W. Ursu, Greene Espel, P.L.L.P., Minneapolis, Minnesota, for Defendants.

---

**INTRODUCTION**

      The Plaintiffs in this action, Paul's Industrial Garage, LLC ("PIG") and Gibson Sanitation, LLC ("Gibson"), are garbage haulers. They commenced this action on December 6, 2006, against the City of Red Wing, Minnesota and two of its officials – Dennis Tebbe, the City's Director of Public Works, and Richard Moskwa, the City's Deputy Director of Public Works – seeking to enjoin the application of a recently enacted City ordinance against them.[1] That ordinance will preclude Plaintiffs from collecting commercial waste in the City after the ordinance becomes effective on January 1, 2007. Plaintiffs now move for a preliminary

---

[1] Hereafter, the Court collectively refers to Tebbe, Moskwa, and the City of Red Wing as "the City."

injunction, arguing that the ordinance violates the Commerce Clause of the United States Constitution. The Court received memoranda of law from all parties and held a hearing on the Motion on December 21, 2006. For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

The City owns an incinerator – the Red Wing Waste-to-Energy Facility (the "Incinerator") – that combusts solid waste. (Moskwa Aff. ¶¶ 2-3.) The Incinerator charges a "tipping fee" for the disposal of waste of approximately $56 per ton.[2] (Gibson Aff. ¶ 6; Larson Aff. ¶ 8.) Other waste disposal locations in the vicinity, including several in Wisconsin, charge lower tipping fees than the Incinerator. (Gibson Aff. ¶ 6; Larson Aff. ¶ 18.) As a result, the Incinerator does not process a sufficient amount of waste on a yearly basis to cover its operating expenses, because many waste haulers choose to deliver garbage (including garbage collected in the City) to less-expensive waste-disposal facilities, including those across the Minnesota border. The Incinerator incurred operating losses of over $200,000 each year from 2003 through 2005. (Daggs Aff. Ex. B.2.)

During late 2004 and early 2005, the City proposed implementing the "organized collection" of commercial waste – in other words, the City would collect all commercial waste generated within its borders. (Moskwa Aff. ¶ 10.)[3] Under its organized-collection plan, the City would require that all commercial waste generated in the City be brought to the Incinerator for

---

[2] The phrase "tipping fee" is derived from the fact that dump trucks hauling garbage must raise and "tip" their back-ends in order to dump their loads. SSC Corp. v. Town of Smithtown, 66 F.3d 502, 505 n.5 (2d Cir. 1995).

[3] Generally speaking, "commercial waste" is waste generated by commercial establishments (not including construction debris) rather than by households. (Moskwa Aff. Ex. G § 10.01, subd. 2.)

disposal. (Id. Ex. D.) The City recited 13 purported goals that would be accomplished by its organized-collection plan, including among other things protecting the health, safety, and welfare of the community; ensuring the reliable and adequate collection of commercial waste; and ensuring that the Incinerator had a sufficient supply of waste to "eliminate or reduce the City taxpayer financial liability from the City's general fund to support the incinerator in its operation." (Id.)

Pursuant to Minnesota law, the City held public hearings in 2005 and 2006 concerning its plan to implement the organized collection of commercial waste. (Id. ¶¶ 12-14.) Not surprisingly, the City's then-licensed commercial-waste haulers objected to the organized-collection plan, because it meant that they would be forced to give up business in the City. (Id. ¶ 15.) In response to these objections, the City proposed entering into contracts with each of the haulers. The City prepared a form contract – a "Solid Waste Delivery Agreement" – and sent that form contract to each of the City's then-licensed commercial-waste haulers. (Id. ¶ 16 & Ex. E.)

The Solid Waste Delivery Agreement mandates that the haulers bring all commercial waste collected in the City to the Incinerator and that the haulers pay the City the appropriate tipping fees for that waste. (Id. Ex. E §§ 2.1, 2.5.) The City has no obligation to pay anything to the haulers under the Agreement; the only consideration flowing to the haulers is their right to collect garbage in the City for a period of ten years.[4] (Id. Ex. E § 6.1.) The Agreement also

---

[4] At oral argument, the City's counsel stated that each Solid Waste Delivery Agreement had a 20-year term rather than a 10-year term. The form Agreement submitted with the City's Motion papers, however, indicates that the Agreement is for a 10-year term. (Moskwa Aff. Ex. E § 6.1.)

contains a clause purporting to waive any challenge the haulers might assert to the constitutionality thereof or any related City ordinance, such as the City's proposed organized-collection ordinance. (Id. Ex. E § 3.6.)

The City informed the haulers that if all of them signed the Solid Waste Delivery Agreement by August 15, 2006, it would not implement organized collection. (Id. ¶ 17 & Ex. F.) If all haulers did not sign the Agreement by the deadline, however, the City would go forward with its plan to implement organized collection, but would exempt from organized collection any hauler that had signed a Solid Waste Delivery Agreement with the City. (Id. ¶ 17 & Ex. F.) In other words, each hauler was faced with two choices: the hauler could either (a) sign the Solid Waste Delivery Agreement, which would permit it to continue collecting commercial waste in the City but would require it to deliver all such commercial waste to the Incinerator (a less-profitable proposition than what had previously existed), or (b) refuse to sign the Solid Waste Delivery Agreement and thereby be completely precluded from collecting commercial waste in the City.

PIG and Gibson were City-licensed commercial-waste haulers at the time the City proposed the organized collection of commercial waste. They refused to sign the Solid Waste Delivery Agreement because they wanted to continue transporting commercial waste to less-expensive disposal facilities in Wisconsin, rather than to the Incinerator. Accordingly, not all haulers signed Solid Waste Delivery Agreements and, as a result, the City carried through on its "threat" and enacted its organized-collection ordinance – City of Red Wing Municipal Code Section 10.02 (the "Ordinance").

Under the terms of the Ordinance, as of January 1, 2007, only waste haulers possessing a license issued by the City may collect commercial waste within City limits. (Moskwa Aff. Ex. G, § 10.02, subd. 8.) Furthermore, only haulers under contract with the City may be issued a license. (Id. subd. 7.) Because PIG and Gibson would not sign the Solid Waste Delivery Agreement, they cannot obtain a license and, accordingly, they will be precluded from collecting commercial waste in the City as of January 1, 2007.

Plaintiffs now seek a preliminary injunction enjoining the City from enforcing the Ordinance against them. They argue that the City's actions in passing the Ordinance and "coercing" haulers to sign the Solid Waste Delivery Agreement violate the Commerce Clause.

## ANALYSIS

**I.**    **Ripeness**

The City first argues that Plaintiffs' claim is not yet ripe because Plaintiffs have not applied for licenses to collect commercial waste in the City and if they were to do so, they might be granted such licenses. (Def. Mem. at 11-12.) The Court disagrees.

The flaw in the City's argument is that plaintiffs generally need not engage in "exercise[s] in futility" in order to establish ripeness. S.D. Mining Ass'n v. Lawrence County, 155 F.3d 1005, 1008-09 (8th Cir. 1998). Here, the Ordinance expressly states that the City may only issue licenses to those applicants who are under contract with the City. (Moskwa Aff. Ex. E § 10.02, subd. 8.) Moreover, the City has mandated that all contract haulers agree to bring such waste to the Incinerator, a condition to which Plaintiffs have made clear they will not agree. Accordingly, there do not appear to be any terms under which the City would enter into contracts agreeable to Plaintiffs; as a result, Plaintiffs are precluded from obtaining licenses under the

Ordinance's express terms. Therefore, there is no need for Plaintiffs to have applied for licenses, because such applications would be futile.

## II.    Injunctive relief

The Court next turns to the merits of Plaintiffs' Motion. In analyzing a request for a preliminary injunction, the Court must look to the four factors set forth by the Eighth Circuit in Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109 (8th Cir. 1981). Those factors are: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Id. at 114. When applying the Dataphase factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999). The party seeking injunctive relief bears the "complete burden" of proving all of the Dataphase factors. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

### A.    Likelihood of success

The Court begins its analysis with Plaintiffs' likelihood of success, which is frequently considered the most important of the Dataphase factors. See S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992). Plaintiffs claim that the City used the "threat" of enacting the Ordinance as a "hammer" to coerce haulers to execute the Solid Waste Delivery Agreement, which mandates the delivery of locally-collected commercial waste to the Incinerator. These actions, according to Plaintiffs, violate the Commerce Clause because they amount to "the exercise of local regulatory power for the purpose of isolating the local waste[-]collection market

from the National market in waste processing and disposal." (Pl. Mem. at 18.)[5] The City raises several arguments in response, but none is persuasive.

### 1. The Commerce Clause's "market-participant exception"

The City first argues that the Court need not engage in a Commerce-Clause analysis at all because it is a "market participant" rather than a "market regulator." It is well-established that where "a state or local government is a market participant in a business, it may pursue its own economic interests free from the constraints imposed by the Commerce Clause within the market in which it is a participant." Red River Serv. Corp. v. City of Minot, N.D., 146 F.3d 583, 586-87 (8th Cir. 1998). This so-called "market-participant exception" recognizes that the Commerce Clause was not intended to prevent state and local governments from operating in a proprietary capacity in the free market, just as private market participants do. Chance Mgmt., Inc. v. South Dakota, 97 F.3d 1107, 1111 (8th Cir. 1996). Here, the City argues that it participates in the market for the collection and disposal of garbage and that, as a market participant, it is free to contract with whomever it chooses, on whatever terms it desires, and that such contracts are beyond the reach of the Commerce Clause. (Def. Mem. at 19-25.) The Court disagrees.

In order to avail itself of the market-participant exception, the City must show that it is "actually participating in a narrowly defined market *as a proprietor rather than simply regulating the actions of other private market participants*." Chance Mgmt., 97 F.3d at 1111

---

[5] Under the Commerce Clause, the Plaintiffs may challenge both the Ordinance and the Solid Waste Delivery Agreements that the City sought to have Plaintiffs sign, because those Agreements arose out of and were "ancillary to" the Ordinance. Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 187 (1st Cir. 1999); see also SSC Corp. v. Town of Smithtown, 66 F.3d 502, 514-18 (2d Cir. 1995) (performing Commerce-Clause analysis of waste flow-control statute as well as contracts entered into as part of that statutory scheme).

(emphasis added).  To act as a "proprietor" in the garbage-collection and garbage-disposal markets, the City must "buy[] or sell[] goods as any private economic actor might."  <u>USA Recycling, Inc. v. Town of Babylon</u>, 66 F.3d 1272, 1281 (2d Cir. 1995) (citing <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 436-39 (1980)).  In other words, the City must expend City funds to procure garbage services in an open marketplace.  <u>See, e.g.</u>, <u>Nat'l Solid Waste Mgmt. Assoc. v. Williams</u>, 146 F.3d 595, 599-600 (8th Cir. 1998) (local government is proprietor in garbage services market when "it undertakes to buy waste services on the open market"); <u>SSC Corp. v. Town of Smithtown</u>, 66 F.3d 502, 515 (2d Cir. 1995) ("Insofar as the city expended only its own funds in entering into [waste disposal] contracts for public projects, it [is] a market participant . . . .") (alteration in original) (citation omitted); <u>see also</u> <u>White v. Mass. Council of Constr. Employers</u>, 460 U.S. 204, 214-15 (1983) (city of Boston was market participant when it used its own funds to contract for construction of city buildings and required contractors to hire specified number of Boston residents).

  Here, the City did not act as a proprietor by "purchasing" the services of its newly licensed commercial-waste haulers, with City funds, on the open market.  In fact, under the terms of the Solid Waste Delivery Agreements between the City and the haulers, the City will pay *nothing at all* for the haulers' services, despite the haulers agreeing to use a less-profitable method to dispose of the City's commercial waste:  the City Incinerator.  Moreover, the Solid Waste Delivery Agreements contain a clause pursuant to which the haulers agreed to waive any constitutional challenges to the Agreements or to the Ordinance.  It is highly unlikely that a

private company, in an open marketplace, would be able to entice others to enter into contracts with such severely one-sided and unfavorable terms.[6]

Rather, it appears that the City used its regulatory powers – in particular, its threat to enact organized collection and thereby stifle the haulers' ability to collect garbage in the City, lest they be subject to criminal sanctions – to coerce the haulers to sign Solid Waste Delivery Agreements. Because those regulatory powers are not enjoyed by others in the garbage-services market, the Court concludes that the City cannot have been acting simply as a "market participant" when it "forced" the haulers to enter into the Solid Waste Delivery Agreements. See SSC Corp., 66 F.3d at 512 (city actions "constitute 'market participation' only if a private party could have engaged in the same actions"; "No private company in the open market could force others to buy its services under pain of criminal penalties."); Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders, 48 F.3d 701, 717 (3rd Cir. 1995) ("market participation does not . . . confer upon [a city] the right to use its regulatory power to control the actions of others in the market"); Zenith/Kremer Waste Sys., Inc. v. W. Lake Superior Sanitary Dist., Civ. No. 5-95-228, 1996 WL 612465, at *8 n.11 (D. Minn. July 2, 1996) (Report and Recommendation of Erickson, M.J.) (no basis to conclude public entity was market participant where it "require[d] all participants in the market to purchase the government service – even when a better price can be obtained on the open market") (citing Atl. Coast, 48 F.3d at 717).

---

[6] At oral argument, the City argued that it could be a "proprietor" in the garbage-services market (and hence avail itself of the market-participant exception) even if it does not buy or sell such services, as long as it "participates" in some fashion in the marketplace. Yet regardless of whether the City "participates" in the garbage-services market without actually buying or selling such services, "local governments do not enjoy *carte blanche* to regulate a market simply because they also participate in that market." USA Recycling, 66 F.3d at 1282. That is precisely what has occurred here.

### 2. The dormant Commerce Clause analysis

Having concluded that the market–participant exception does not apply, the Court next engages in a Commerce-Clause analysis of the Ordinance and the Solid Waste Delivery Agreements.[7] The Commerce Clause grants Congress the power "to regulate commerce . . . among the several states." U.S. Const., art. I, § 8, cl. 3. It has long been held that this grant of power to Congress contains "negative implications that restrict states' power to regulate interstate commerce." Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1383 (8th Cir. 1997). Under this "dormant Commerce Clause" jurisprudence, state actions that regulate commerce are evaluated under a two-step inquiry.

First, the Court must determine if the challenged action "overtly discriminates against interstate commerce." U & I Sanitation v. City of Columbus, 205 F.3d 1063, 1067 (8th Cir. 2000). Such discrimination may take one of three forms, namely, (1) the action may be discriminatory on its face or, if facially neutral, may have (2) a discriminatory purpose or (3) a discriminatory effect. Id. "Discrimination" in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id. Second, if the challenged action does not "overtly discriminate" against interstate commerce, it will nevertheless be invalidated if the burden it imposes on interstate commerce clearly exceeds the action's putative local benefits. Id.

Despite the City's protestations to the contrary, the inescapable conclusion here is that the Ordinance and the Solid Waste Delivery Agreements have a discriminatory purpose: they

---

[7] It has long been held that "[t]he interstate movement of solid waste is 'commerce' under the Commerce Clause." Waste Sys. Corp. v. County of Martin, Minn., 985 F.2d 1381, 1386 (8th Cir. 1993) (citing City of Phila. v. N.J., 437 U.S. 617, 622-23 (1978)).

favor the City's economic interest by forcing all commercial waste to be disposed of at the Incinerator while, at the same time, they burden out-of-state interests by preventing the transportation of commercial waste across state lines for disposal. Indeed, the City admits that one of the purposes behind enacting the Ordinance was to divert sufficient waste to the Incinerator so as to "eliminate or reduce the City taxpayer financial liability from the City's general fund to support the incinerator in its operation." (Moskwa Aff. Ex. D at 2.)

To argue that there was no discriminatory motive behind the "threat" of organized collection and the Solid Waste Delivery Agreements, the City directs the Court's attention to a litany of environmental, health, and safety goals it allegedly hoped to achieve by implementing organized collection. (Id.) As Plaintiffs pointed out at oral argument, however, these concerns are illusory. Indeed, the City's own website indicates that compelled delivery of waste to the Incinerator was not implemented for environmental or health purposes, but rather for the City's "fiscal health." (See Daggs Aff. Ex B.1 (plan for delivery of all commercial waste to the Incinerator is listed under "Fiscal Health" section of City's "2006/2007 City Council Goals," rather than "Quality of Life Issues" section).)

Moreover, the City fails to proffer any evidence that the compelled delivery of commercial waste to the Incinerator – as opposed to incinerators elsewhere in Minnesota or across state lines – was in any way necessary to achieve the City's purported environmental, health, and safety goals. For example, the City claims that its "greatest concern" behind enacting the Ordinance was the disposal of the City's commercial waste "in accordance with the state's waste management heirarchy." (Id. Ex. D at 5.) That heirarchy – contained in Minnesota Statutes Section 115A.02 – expresses a preference for the incineration of garbage rather than its

burial in landfills. Yet, there is no reason why the City must require the combustion of garbage in *its* Incinerator in order to achieve this goal. Indeed, the same goal would be achieved if, for example, the City's commercial waste were shipped to Wisconsin for incineration.[8]

The City also argues that the Ordinance is unassailable because organized-collection ordinances have been repeatedly upheld in the face of Commerce-Clause challenges. (See Def. Mem. at 14 ("If the City can constitutionally adopt a system of organized collection, Plaintiffs can never secure an order from this court precluding the [C]ity from putting that system into effect.").) The City is mistaken, for it ignores a critical distinction between the Ordinance in this case and the organized-collection ordinances in the cases it cites: the Ordinance here is nothing more than a guise (or, in the Plaintiffs' parlance, a "sham") intended to force garbage haulers to transport commercial waste to the Incinerator so that the City can collect more tipping fees. By contrast, valid organized-collection ordinances pursuant to which a city contracts-out its garbage collection services generally involve a competitive bidding process in which there is "no requirement that local interests be favored in the performance of the contract." Southern Waste Sys. LLC v. City of Delray Beach, Fla., 420 F.3d 1288, 1291 (11th Cir. 2005). Here, there was no competitive bidding process, and the Solid Waste Delivery Agreements the City attempted to foist onto Plaintiffs favor the City's own economic interests over out-of-state interests.

---

[8] At oral argument, the City suggested that it needs to control where and how City waste is disposed of in order to avoid liability under the "Superfund" statute, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). But the City could avoid any such liability by requiring garbage haulers transporting City waste across state lines to indemnify the City – for example, by posting a high bond or by acquiring liability insurance – in the event that waste were not disposed of in accordance with CERCLA.

Simply put, in order to increase revenue for its economically untenable waste-disposal plant, the City strong-armed garbage haulers (and attempted to strong-arm the Plaintiffs) into agreeing to bring all commercial waste to the Incinerator, lest they lose the right to conduct business in the City. This is precisely the type of "economic protectionism" that the dormant Commerce Clause is intended to prevent. Waste Sys. Corp. v. County of Martin, Minn., 985 F.2d 1381, 1385 (8th Cir. 1993).

The City points to a recent Second Circuit case – United Haulers Association v. Oneida-Herkimer Solid Waste Management Authority, 261 F.3d 245 (2d Cir. 2001) – for the proposition that state action may be held invalid under the Commerce Clause only if it favors a local *private* business rather than a local *public* facility. (Def. Mem. at 25-27.) The Eighth Circuit, however, has never adopted this view; in fact, it has implicitly rejected it on more than one occasion. See, e.g., U & I Sanitation, 205 F.3d at 1067-68; Waste Sys., 985 F.2d at 1385-89. Moreover, the Sixth Circuit has explicitly rejected the Second Circuit's holding in United Haulers. See Nat'l Solid Waste Mgmt. Assoc. v. Daviess County, Ky., 434 F.3d 898 (6th Cir. 2006). The Court concludes, therefore, that the public/private distinction is an insufficient basis on which to deny Plaintiffs injunctive relief.[9]

Based on the record currently before it, the Court concludes that the organized-collection Ordinance and the Solid Waste Delivery Agreements ancillary to it are "overtly discriminatory"

---

[9] The City also notes that the Supreme Court has recently granted a petition for a writ of *certiorari* in United Haulers and argues that the Court should refrain from ruling on Plaintiffs' Motion until the Supreme Court issues its opinion in that case. (Def. Mem. at 27-28.) Given the irreparable harm that Plaintiffs will suffer absent injunctive relief, as discussed below, the Court declines the City's invitation to stay this case – which, in practical effect, would be the same as denying Plaintiff's Motion – pending the outcome in United Haulers.

because they have a clear discriminatory purpose. Such a finding "is almost always fatal," Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 185 (1st Cir. 1999), because it subjects the actions in question to "rigorous scrutiny." U & I Sanitation, 205 F.3d at 1067. Applying that exacting standard here, the City's actions can be upheld only if the City can demonstrate that it "has no other means to advance a legitimate local interest." Id. The City has not attempted to satisfy this standard, and the Court concludes that it cannot do so.

Indeed, the City's primary (if not sole) motivation for its actions – generating revenue for the Incinerator – "is not a local interest that can justify discrimination against interstate commerce." Carbone, Inc. v. Town of Clarkston, 511 U.S. 383, 393-94 (1994). Moreover, even if the Court were to accept at face value the alleged environmental and public safety goals cited by the City when enacting the Ordinance, those goals clearly can be accomplished in ways other than mandating the delivery of all commercial waste to the Incinerator, such as by enacting restrictions on the amount of commercial waste permitted by City businesses or by mandating that all commercial waste be incinerated, *regardless* of where that incineration occurs.

For all these reasons, the Court concludes that Plaintiffs are likely to succeed on the merits of their Commerce-Clause claim.

### B. Irreparable harm

Because the Court concludes that Plaintiffs are likely to succeed on the merits, it may presume that Plaintiffs will suffer irreparable harm in the absence of injunctive relief. See, e.g., ACLU v. Johnson, 194 F.3d 1149, 1163 (10th Cir. 1999); Allen v. Minnesota, 867 F. Supp. 853, 859 (D. Minn. 1994). Even without that presumption, however, the Court would find that irreparable harm would result due to Plaintiffs' impending loss of City customers and business

goodwill. See, e.g., Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003) ("Loss of . . . reputation and goodwill can constitute irreparable injury."). In fact, the evidence proffered by Plaintiffs indicates that the City has already begun calling Plaintiffs' customers and informing them that they will no longer be able to do business with Plaintiffs after January 1, 2007, inevitably damaging Plaintiffs' reputations. (Larson Aff. Exs. A.5 through A.12.)

### C.     Balance of equities and the public interest

The Court further concludes that the potential harm to Plaintiffs absent an injunction greatly outweighs any harm that the City might suffer if an injunction were granted. Indeed, an injunction would in no way impair commercial-waste collection in the City or the delivery of a substantial portion of that waste to the Incinerator, in light of the Solid Waste Delivery Agreements many garbage haulers have already signed. Those Agreements would in no way be affected by an injunction enjoining enforcement of the organized-collection Ordinance as against Plaintiffs. Nor has the City proffered any evidence that haulers already under contract with the City would be placed at a competitive disadvantage if an injunction were to be granted. Indeed, it is likely that many (if not most) of those haulers' customers have signed contracts that probably cannot be broken simply to receive cheaper garbage-collection services from the Plaintiffs here.

For all the foregoing reasons, the Court concludes that Plaintiffs' Motion for a Preliminary Injunction should be granted.

### D.     Bond

Pursuant to Federal Rule of Civil Procedure 65(c), the Court must set an appropriate bond when granting preliminary injunctive relief. Plaintiffs argue that no bond is appropriate in this "public interest" litigation (Pl. Mem. at 24-25), while the City argues that a $1 million bond would be appropriate because of "substantial losses the City stands to occur if an injunction issues" (Def. Mem. at 32-34).

The amount of the bond is entrusted to the Court's sound discretion; it should be set in an amount that will insure the non-movant against any financial loss it might sustain as a result of the injunction, in the event the non-movant ultimately prevails in the litigation. <u>N. States Power Corp. v. Fed. Transit Admin.</u>, 270 F.3d 586, 588 (8th Cir. 2001). Because, as noted above, the Court perceives little (if any) harm that might befall the City by granting an injunction, the Court will require Plaintiffs to post a bond of $1,000.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is **ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 11), which the Court construes as a Motion for Preliminary Injunction, is **GRANTED** as follows:

1.  Defendants City of Red Wing, Dennis Tebbe, and Richard Moskwa, and any person or entity acting in concert with them or on their behalf, are hereby enjoined, pending further order of this Court, from directly or indirectly enforcing all or any part of City of Red Wing Municipal Code Section Section 10.02 so as to prohibit Plaintiffs from collecting and hauling Commercial and Industrial Solid Waste (as that term is defined in Municipal Code

Section 10.01 subd. 2) that is generated in the City of Red Wing, by entities other than the City of Red Wing, to out-of-state facilities for processing, recycling and/or disposal; and

2. Plaintiffs shall post a bond of $1,000 for the payment of such costs and damages as may be incurred or suffered by the City if it is found to have been wrongfully enjoined. Upon the posting of the bond, the injunction provided for herein will become effective.

Dated: December 22, 2006                     s/ Richard H. Kyle
                                                              RICHARD H. KYLE
                                                              United States District Judge